## CHISHOLM et al. v. JOHNSON.

### (Circuit Court, D. Delaware. January 7, 1901.)

### No. 197.

1. PATENT—VALIDITY—INFRINGEMENT.

Claim 5 of letters patent No. 387,318, granted to Robert P. Scott, August 7, 1888, for improvements in machines for hulling and separating green peas, sustained, but *held* not to have been infringed.

2. SAME.

Letters patent No. 421,244, granted to Charles P. Chisholm and John A. Chisholm, February 11, 1890, for improvements in the method of hulling green peas, sustained, and *held* to have been infringed as to both of its claims.

3. SAME.

Claim 2 of letters patent No. 499,397, granted to Robert P. Scott, June 13, 1893, for a process of gathering and hulling green peas from the vines, sustained, and *held* to have been infringed.

4. SAME.

Claims 1, 2, 3, 4, 5 and 6 of letters patent No. 500,299, granted to Robert P. Scott, Charles P. Chisholm and John A. Chisholm, June 27, 1893, for improvements in pea-hulling machines, sustained, and *held* to have been infringed.

5. SAME—PRIOR USE.

An unexpected, insignificant and accidental use of a process, not appreciated or understood at the time, cannot operate to anticipate or invalidate a patent subsequently granted for such process.

6. SAME—CONSTRUCTION.

Patent No. 421,244 does not cover the mere function or result of the operation of mechanical apparatus, but the invention of a new and specific application of the forces of nature for the advancement of the art of hulling green peas, and is for a true process.

7. EQUITY—MULTIFARIOUSNESS.

Whether the objection of misjoinder or multifariousness can or cannot properly be taken by way of answer, the court sua sponte may give effect to it whenever that course is deemed conducive to the due and convenient administration of justice.

8. PATENT—SUIT FOR INFRINGEMENT.

In a suit in equity for the infringement of a patent an exclusive licensee properly may for the protection of his own interests, and in many cases must, be joined with the legal owner of the patent as cocomplainant; and generally, where the legal title to a patent is vested solely in one person and a suit in equity is brought for infringement, seeking an injunction and an account, the legal owner and those possessing equitable rights which may be affected by the litigation, should join as complainants.

9. SAME—MULTIFARIOUSNESS.

The bill, having averred that all the inventions covered by the four patents in suit were capable of conjoint use in the same structure, and that the defendant so used the same in the infringements complained of, was not demurrable on the ground of multifariousness by reason of the joinder of patents; and the complainants having proved infringement by the conjoint use of inventions covered by three of the patents, although failing to prove infringement of the remaining patent in suit, are entitled to relief.

10. SAME—MISJOINDER OF PARTIES.

While the joinder of patent owners as complainants, where some of them have no legal ownership of or legal interest in some of the patents sued on, is a course which generally should not be encouraged, and while it appears that one of the complainants is the sole owner of two of the patents in suit, and the three complainants are the

joint owners or owners in common of the remaining two, the objection of misjoinder of parties cannot, on the facts disclosed in this case, be sustained.

(Syllabus by the Court.)

In Equity.

For former opinion, see 84 Fed. 384.

Gustav Bissing and Henry A. Seymour, for complainants.

R. S. Taylor, for defendant.

BRADFORD, District Judge. The bill charges infringement of four patents, namely, patent No. 387,318, dated August 7, 1888, granted to the complainant Robert P. Scott, patent No. 499,397, dated June 13, 1893, also granted to the same complainant, patent No. 421,244, dated February 11, 1890, granted to the complainants Charles P. Chisholm and John A. Chisholm, and patent No. 500,299, dated June 27, 1893, granted to all the complainants. All these patents relate to processes or machinery for hulling green peas.

It appears from the evidence that the practical application of the inventions covered by the patents in suit has to a phenomenal extent' revolutionized the art of hulling green peas. In 1886 practically all the green peas hulled in this country were hulled by hand. In 1888 of all the green peas hulled in this country for canners, estimated at 1,000,000 cases, about one-half were hulled by the process and machinery of these patents or some of them. In 1889 the proportion rose to about two-thirds, and since 1891 substantially all green peas hulled in this country for canners have been hulled by such process and machinery, less than one per cent. being hulled by hand.

The remarkable success which has attended the operation of these patents is fully accounted for by the advantages resulting both to the growers and consumers of green peas. The peas are hulled with practically no injury to them caused by the process. The saving of labor is enormous, one machine of the type shown in patent No. 421,244 doing the work of from 250 to 300 hands. The pea vines with filled pods attached are speedily taken from the field and forthwith subjected to the pea-hulling process, thereby avoiding the danger of spoiling before being canned.

The broad discovery underlying the patents in suit is that the force of impact may be so applied to pods filled with green peas as to burst the pods and release the peas without injury to the latter. The original application for patent No. 421,244, granted to Charles P. Chisholm and John A. Chisholm, for "Improvements in the Method of Hulling Peas" was filed January 3, 1887, and included the method or process subsequently patented, and also apparatus for the practice of the same. The application was divided and the divisional application, on which the patent was granted, was filed March 2, 1889. In the description the patentees say:

"The object of this invention is to remove green peas from their pods without injury to the peas; and the invention consists in the novel process of accomplishing the above object, as will be more fully hereinafter described and claimed. The desired result may be accomplished by various apparatuses

without departing from the spirit of our invention. We have illustrated the preferable apparatus, but without in any way restricting our claims. An apparatus for accomplishing the same result is shown in our application filed January 3, 1887, Serial No. 223,170, of which this is a division.

"We are aware that in addition to the usual mode of shelling peas by hand several processes of accomplishing the same object by machinery have been proposed—as, for instance, passing the pods between elastic rollers, opening the pods by passing them through the intermeshing fingers, and by rubbing the pods between abrading-surfaces, all of which have been found to bruise and injure a large portion of the peas, and are therefore very objectionable in actual use.

"Now, we have discovered that green peas may be hulled by impact while in free air, and the process of this application is based on this discovery. By 'impact' we mean the striking of a solid body against the pods while the latter are so situated that nothing but the resistance of the air holds them against the action of the solid body.

"The impact may be given by a variety of apparatuses. For instance, a paddle, beater, or impact opener in the hands of a workman, swung with just the proper velocity, impacting the peas while falling through the air, would execute this process; but we prefer the apparatus in the accompanying drawings, in which—Figure 1 is a perspective view with parts broken away; Figure 2 is a cross-section of the same without the outer casing.

"In this apparatus the peas are carried to an elevated position in the upper portion of a revolving cylinder, from whence they drop, and while falling through the air they are struck by the beaters, which revolve preferably in the same direction as the cylinder, but at a much greater rate of speed. The cylinder should revolve at just such a speed as not to carry the pods around by centrifugal force, but carry them up and then drop them, and in falling through the air they are struck by the beaters, which may or may not be covered by some soft material (as rubber or leather) to soften the blow.

"The pods must be struck by a sharp quick blow, which should be just sufficient to crack them open—that is, to sever the connection of the two half-shells of the pod, the connection of the peas with the pods being severed by the same operation. The air naturally confined in the pods protects the peas from being bruised."

The claims are as follows:

"1. The improvement in the art of hulling green peas, which consists in removing the same from the pods by impact, substantially as described.

"2. The improvement in the art of hulling green peas, which consists in carrying the filled pods to an elevated position and impacting the filled pods while falling, so as to sever the connections of the two half-shells of the pod and of the peas with the pods at one operation, substantially as described."

The application for patent No. 387,318, granted to Robert P. Scott for "Improvements in Machines for Hulling and Separating Green Peas" was filed November 7, 1887, or about ten months after the filing of the original application for the process patent No. 421,244. In the description Scott says:

"My invention has relation to machines for hulling or releasing green peas from their pods or hulls and subsequently separating the same, and is designed as an improvement on the machine forming the subject of an application for Letters Patent filed by Charles P. Chisholm and John A. Chisholm, January 3, 1887, Serial No. 223,170. * * * The object of my invention is to provide for a perfect hulling or removal of peas from their pods and a subsequent separation of said peas from the pods and dirt. * * * The operation of my improved machine is as follows: The peas in the hulls or pods are fed into the slowly-revolving cylinder by the propeller or feed screw. They are then elevated to a point above the horizontal centre of said cylinder by means of its interior longitudinally-arranged ribs. They then fall from said ribs, and in their descent are struck with sudden or impact blows by the rapidly-revolving openers or beaters, which split the pods or hulls, release

the peas, and throw them against the inner sides of the cylinder. The released peas then pass to the lower surface of said cylinder, drop out of the same mainly through the perforation in the leather-covered portion thereof, and fall upon that part of the inclined apron which is directly beneath, down which they roll, notwithstanding the upward movement of the upper surface of said apron, and are delivered into any suitable receptacle, the hulls or open pods and the refuse being carried over the upper end of the apron. * * * Thus it will be evident that the released peas and open pods or hulls are delivered out of the cylinder at different points, fall upon the inclined apron at different points, and remain practically separate from each other while being agitated and delivered, respectively, at the lower and upper portions of said apron."

The charge of infringement of this patent has been restricted to claim 5. It is as follows:

"5. In a machine for hulling and separating green peas, an endless inclined separating apron provided with transverse slats arranged on the inside thereof, in combination with the rollers and the vertical sideboards arranged at the sides or edges of said apron and operating to keep the same straight upon said rollers, substantially as described."

The process of patent No. 421,244 and the apparatus of patent No. 387,318 are respectively known as a podder process and a podder apparatus, as they both deal with pea pods separate from the vines. The two other patents in suit hereinafter considered respectively cover what are known as a viner process and a viner apparatus as they both deal with the pods while attached to the vines.

Prior to the making of the inventions covered by the podder process patent No. 421,244 and the podder apparatus patent No. 387,318, many machines had been made and patented in this country more or less similar in construction to that of the latter patent and applied to various uses. The hulling of dried peas, rice, wheat and other grains by machinery was old in the art. They were subjected to a process of threshing or abrasion by which the pods, hulls or husks were disintegrated or torn apart; but the dried peas, rice, wheat or other grains being harder and tougher than the pods, hulls or husks containing or surrounding them, escaped uninjured by the severity of the treatment.

The hulling of green peas by machinery presented a wholly different problem by reason of their nature and the construction of the pods containing them. The pod consists of two trough-shaped half-shells. The junction of these shells along their edges or their suture is of a leguminous growth. Each pod contains a number of green peas connected therewith along the meeting edges of the half-shells by a tender and fragile filament. The peas do not fill the pod; the remaining space within the pod being filled with air. The pod is practically hermetically sealed or air-tight. The green peas are soft and tender, but the pod is tough. But though tough it is not brittle. It is not capable of being disintegrated by a shattering process without destroying or bruising the enclosed peas. The weakest part of the pod is along the line of its suture.

Before the inventions in suit three plans had been suggested for hulling green peas by machinery. One was the intermeshing finger process, by which the pod was caught by two stationary fingers, one at each end of the pod, and had its back broken by a movable finger

acting between the two stationary fingers holding the pod. It was a process of distorting the pod to the breaking point. It does not appear that this process was ever used commercially. It was of such a nature as to bruise the peas. Another plan was the roller process, by which the pod passed between a lower cylindrical roller and an upper screw threaded roller, and, while so passing, was broken open on the line of the suture. While this process was tried at two canning houses it does not appear to have been successful. It could not hull in large quantities, nor could it hull a high-grade or very green pea. The remaining plan was the abrading process. It is fairly illustrated by the apparatus shown in Patent No. 295,305, granted to Alfred Swingle, March 18, 1884. Various attempts at much cost were made to introduce the abrading process in different forms. But it was a failure, for the reason that most of the peas hulled were bruised or broken, while in one or more instances some of the pods passed through the machine without hulling. The problem how to hull green peas by machinery in large quantities, expeditiously and without injury to them, remained unsolved, certainly in this country, notwithstanding widespread and continued efforts on the part of skillful inventors and large expense incurred to reach the desired result, until the Chisholms made the discovery embodied in Patent No. 421,244. I say, in this country, for the reason that it is strongly urged by the defendant that the invention covered by that patent was anticipated by a French patent to Madame Faure hereinafter referred to.

The Chisholms conceived the idea that the force of impact within certain limits of velocity could be applied to the green pea pod while falling through or moving in the air in such manner as to burst the pod and liberate the peas without injury to the latter. Their idea was not to deal the pod such a blow as to shatter it and thereby bruise or crush the peas, but by a comparatively gentle impact to compress the air within the pod sufficiently to cause the pod to burst or explode, the air within the pod serving as a cushion for the enclosed green peas and preventing injury to them from the impact on the pod.

It was an entirely new conception of the application of natural forces to produce the long-sought result. There was nothing in the prior art in this country to suggest the invention. It was purely the result of inventive genius. This is the broad and meritorious discovery underlying the podder process in suit.

The defendant urges that the podder process patent was clearly anticipated by the first certificate of addition to the French patent granted to Madame Faure. The original patent is dated May 15, 1883, while that of the first certificate of addition is October 26, 1883. A second certificate of addition was granted to her dated May 5, 1884, and a third dated May 30, 1885. The improved machine of the second certificate of addition to the original Faure patent was patented in various foreign countries including Germany and England. The German patent, being No. 29,463, is dated November 8, 1889, and the English patent, being No. 6,026, bears date April 5, 1884. This machine is also shown in the French periodical La Nature, published April 11, 1885. Careful examination of this French

patent, together with its certificates of addition, has fully convinced me that Madame Faure contemplated only an abrasion process, and had no conception of an impact process, such as is covered by the podder-process patent in suit.

The original Faure patent was granted for "A new machine for shelling green peas, beans, flageolets, lima beans, etc." The certificates of addition were for improvements of that machine. T mechanism of the first certificate of addition, so far as material this connection is represented by the following drawing:

There is a cylinder or drum covered with some perforated material. In the cylinder and attached thereto are a number of longitudinal ribs Z called counter-beaters or cross-bars by Madame Faure. There is an inner revolving shaft A provided with arms F for the support of four blades or beaters X, the latter being rigidly attached to the arms. The inner faces of the counter-beaters are grooved or corrugated, and approach much nearer to the outer ends or edges of the beaters X than the ribs do to the beaters in the machine employed in the podder process in suit. The inner face of the counter-beaters have considerable breadth, and their lateral faces are so inclined or tapered as to permit the pods to slide off before being carried very high in the cylinder. Both the cylinder and the beaters revolve in the same direction, but at different rates of speed; the latter revolving much more rapidly than the cylinder. In the above drawing two grooves appear on the inner face of each counter-beater, while in the machine of the original patent it appears that each counter-beater had only one groove on its inner face.

Madame Faure in the translated description of the original patent says:

"Each cross-bar is provided with a round groove for receiving or retaining the husk of the peas or beans, which is very important during the rotation for obtaining the turning friction when the beater with blades is revolving. The husk being rolled in this groove, retaining the same, produces its opening, not a complete opening, however, at first, but the husk after this first friction will present itself successively before all the cross-bars until it is completely shelled; not a single grain will escape the shelling for the reason, that it affords a resistance preventing it from passing between the blades. * * * The drum revolving slowly accompanies the trituration of the husks, the crushing or squashing in this way being avoided; it serves then as a hopper, throwing again and again the husks between the meeting of the two frictions."

In the translated description of the first certificate of addition it is said:

"The beater is moved at a speed of about hundred fifty to two hundred revolutions in a minute, or more or less, the speed corresponding with the quality of the peas, while the counter-beater has only a speed of about ten to forty revolutions in a minute, revolving—as will be seen—in the same direction as the beater, or, if necessary, in the opposite direction. The peas having been put into the hopper fall in the empty space where the beater moves and are conducted gradually to the other end, where they escape; but during this time—in consequence of the spiral form given to the beaters—they are crushed and shelled between the beaters and counter-beaters. The counter-beater renews in revolving continually the contacts, lifts up the mass, throws it back on the beater and acts in such way that all husks are crushed and emptied without accumulating towards the bottom and also without the peas being smashed or even damaged."

In the translated description of the second certificate of addition, it is said:

"The counter-beaters K are preferably of wood, but they can be made of any other convenient material; they can be provided on their working face with grooves or longitudinal undulations. * * * The peas or other vegetables to be husked are placed in the hopper Y; they come between the beater and the counter-beater. * * * During this time—in consequence of the helicoid form of the blades—the husks have allowed the peas to escape and to pass through the meshes of the net. The counter-beater renews by its revolution continually the contacts, lifts up the mass, throws the same back on the beater and prevents the husks from accumulating at the bottom."

The third certificate of addition throws no light upon the point under discussion. Both the German and English patents were later than the first certificate of addition to the Faure French patent. In the translated description of the German patent Madame Faure says:

"The peas or other fruits-with-hulls to be shelled are poured into the funnel Y, figs. 1 and 5; they get between the beater-bars J and K of the beater and counter-beater, which rotate with different velocities in the same direction. * * * By reason of the somewhat screw form of the beater J. the transit of the fruit-with-hulls and their shelling between the bars of the two beaters along their entire length is facilitated. The counter-beater through its rotation constantly brings new touching surfaces against the inner beaters, lifting the mass of the fruits-with-hulls and leading them toward the inner beater."

In the provisional specification of the English patent it is said:

"The beater and counter beater rub or press the peas introduced into the interior of the machine by means of a hopper, throwing out the shells at one end and allowing the peas to pass through the net-work."

In the complete specification of the same patent it is said:

"The principal feature of this invention consists in causing the peas or other like vegetables to be shelled to pass between a beater and a counter beater both moving in the same direction but at different speeds."

In the translated article from La Nature it is said:

"The peas are placed upon the platform of the machine and fed by hand into the drum by a conduit shown at the top of our engraving. Then they are submitted to the action of the palettes which produces a kind of threshing. The peas, hulled by this threshing, pass through the cloth and by reason of the helical form of the palettes, the pods continue to advance to the opposite end of the drum when they fall by a special conduit. The peas not hulled are raised to the upper part of the drum by the rods which form projections into the interior. The pods, thus raised, are struck by the palettes in such a way that the hulling is complete before they have traversed the length o. the drum."

It is thus evident that the Faure process was regarded by her and others as one of abrasion or threshing only. If the Chisholm impact process had been in her mind, it is impossible to account for the omission of any reference to it in any of the patents or papers relating to the operation of her machinery. Nor was there anything in the structure or operation of her machinery to suggest the podder process in suit to one skilled in the art; for that machinery was understood to operate on a well-known principle wholly different from that of the Chisholm process. The evidence clearly shows and it is practically admitted that the machine disclosed in the German and English patents and in the article from La Nature was the perfected machine of the Faure second certificate of addition, and that it could not hull green peas by the Chisholm impact.

It is, however, urged by the defendant that whatever may have been the understanding of Madame Faure, the machine of the first certificate of addition did operate on the principle of impact as embodied in the podder process in suit and therefore anticipated it. The defence of anticipation must be established by clear and convincing proof in order to overcome the presumption of validity of a patent. The onus rests on the defendant. It is claimed by him that a machine built and run as directed in the first certificate of addition would necessarily embody and use the method of the Chisholm podder process for two reasons; first, the Faure machine could not, except to an insignificant extent, hull green peas by abrasion or friction, and, secondly, the beaters of that machine moved with sufficient velocity to produce the impact of the Chisholm process.

In support of the first reason it is urged that, while it is possible that pods were caught between the beaters and the edges of the crossbars or counter beaters, and hulled by friction or abrasion, it could happen only rarely, or in the language of counsel, there was only one chance in thousands that it would occur. This theory is at best a mere inference drawn from the structure of the Faure machine, and the supposed hulling of all the green peas fed in the pod to it. But the structure and natural operation of the machine, aside from all considerations of velocity of impact, do not warrant such inference. As stated in the description of one of the certificates of addition the peas "come between the beater and the counter beater moving at different

speeds, but in the same direction." There being a number of beaters and counter beaters so moving, it is evident that the pods containing a very large proportion of the peas in passing from one end of the machine to the other were abraded and the peas in them thereby hulled. The statement in the description of the German patent is applicable here, namely, "the counter beater through its rotation constantly brings new touching surface against the inner beaters," and also the statement touching the cylinder or drum in the description of the original Faure patent, namely, "it serves, then, as a hopper, throwing again and again the husks between the meeting of the two frictions."

Whether the machine of the first certificate of addition was successful, or what proportion of the peas introduced into it were hulled, does not appear from the evidence. In fact there is no legal evidence in the case that any of the Faure machines operated successfully.

The further question then is presented whether the beaters of the Faure machine under discussion moved with sufficient velocity to produce the impact of the Chisholm podder process. It is obvious and admitted that green peas in their pods while falling through or moving in the air can be hulled by impact without injury only by blows struck at a suitable velocity. An excessive velocity will bruise or break the peas, while an insufficient velocity will fail to open the pods. A suitable velocity varies within certain limits according to the age or condition of the peas, and is not limited to one specific rate even with respect to peas of the same age or condition. In the machine shown in the podder process patent in suit the outer tips of the beaters are sixteen inches from the geometrical axis of the cylinder. The description states that the beaters should make about 180 revolutions per minute; but that the speed thus given should not be taken as limiting the patentees to that precise speed. In the Faure machine of the first certificate of addition the outer tips of the beaters are 13 inches from the geometrical axis of the cylinder. The description states that the beaters move at about 150 to 200 revolutions per minute more or less. According to the evidence green peas may be hulled by the Chisholm process at a beater velocity varying from 22 or possibly 18 to 35 feet per second as extreme limits. The velocity best accomplishing the desired result is about 24 feet per second. The beaters of the machine employed in the Chisholm podder process make from 180 to 200 revolutions per minute, never having exceeded 210 revolutions. At the minimum of 180 the tips of the beaters have a velocity of 25.1 feet per second, and at the maximum of 210 a velocity of 29.3 feet. The tips of the beaters of the Faure machine at the minimum rate of 150 revolutions per minute have a velocity of 16.9 feet per second, and at the maximum of 200 a velocity of 22.6 feet. The velocity of the tips of the beaters employed in the Chisholm process varies from 25.1 to 29.3 feet, while the velocity of the corresponding parts in the Faure machine varies from 16.9 to 22.6 feet; showing that, considering the speed of the tips of the beaters alone, and assuming that all the pods were struck at that velocity, only an insignificant proportion of the peas, consisting of the youngest and most tender, could, under any circumstances, be hulled by the Faure machine under the impact of the Chisholm

process. But the velocity of the tip or outer edge of the revolving beater is necessarily greater than the average velocity of its whole face, and it cannot reasonably be assumed that the only part of the beater which comes in contact with the pod is its tip. A point on the face of the beaters two inches from their tips would give a velocity of from 21.8 to 25.6 feet in the machine employed in the Chisholm process, and from 14.3 to 19.1 feet in the Faure machine. This is further, and in my judgment, conclusive evidence that the Faure machine could not hull green peas by the Chisholm impact, or, if it could, that the proportion thus hulled was so insignificant as to be practically inappreciable.

Such hulling, if any occurred, was not contemplated by Madame Faure and was purely incidental or rather accidental and commercially unimportant. That such an unexpected, insignificant and accidental use, if it occurred at all, was insufficient to serve as an anticipation of the Chisholm podder process is well settled law. Tilghman v. Proctor, 102 U. S. 707, 711, 26 L. Ed. 279; Andrews v. Carman, 13 Blatchf. 307, Fed. Cas. No. 371; Clough v. Barker, 106 U. S. 166, 1 Sup. Ct. 188, 27 L. Ed. 134; Ransom v. New York, 20 Fed. Cas. 286 (No. 11,573); Boyd v. Cherry, 4 McCrary, 70, 50 Fed. 279; Filter Co. v. Erdrich (C. C.) 98 Fed. 300; Wickelman v. A. B. Dick Co., 31 C. C. A. 530, 88 Fed. 264; Pittsburg Reduction Co. v. Cowles Electric Smelting & Aluminum Co. (C. C.) 55 Fed. 301, 307.

It is equally well settled that the podder process patent is not void on the ground that the function of a machine is not patentable. That patent is not for the mere function or result of the operation of mechanical apparatus. It does not cover the hulling of green peas generally and in the abstract. The Chisholms invented a new and specific application of the forces of nature for the advancement of a certain art, namely, the hulling of green peas with better and more useful results than had theretofore been known. It was a new and useful mode of treatment by impact at certain velocities by which the state or condition of the material subjected to it was changed from pods filled with green peas to pods and green peas separated from each other. On the authorities it was not the mere function of a machine within the meaning of the court in Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899, but was patentable as a true process. Mowry v. Whitney, 14 Wall. 620, 20 L. Ed. 860; Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064; Fermentation Co. v. Maus, 122 U. S. 413, 7 Sup. Ct. 1304, 30 L. Ed. 1103; Lawther v. Hamilton, 124 U. S. 1, 8 Sup. Ct. 342, 31 L. Ed. 325; Telephone Cases, 126 U. S. 1, 533, 8 Sup. Ct. 778, 31 L. Ed. 863; Chicago Sugar Refining Co. v. Charles Pope Glucose Co., 28 C. C. A. 594, 84 Fed. 977; Simonds Rolling-Mach. Co. v. Hathorn Mfg. Co. (C. C.) 90 Fed. 201, 209; Id., 36 C. C. A. 24, 93 Fed. 958; Melvin v. Potter (C. C.) 91 Fed. 151. Both claims of the podder process patent No. 421,244 are unobjectionable and are therefore sustained as valid.

Claim 5 of the podder-machine patent, No. 387,318, is as follows:

"5. In a machine for hulling and separating green peas, an endless inclined separating-apron provided with transverse slats arranged on the inside thereof, in combination with the rollers and the vertical side boards arranged at the sides or edges of said apron and operating to keep the same straight upon said rollers, substantially as described."

It is contended that the combination of this claim was not only not patentable, in view of the prior art, but had been directly anticipated by various more or less similar devices. In the description the patentee says:

"It is a well-known fact that it is extremely difficult to cause a wide belt or apron of canvas or other material to run straight over rollers and at the same time permit of the necessary vibration for effecting a proper separating action, and, so far as I am aware, these results have hitherto been but indifferently obtained. In my machine, as stated, the apron is not only caused to run straight, but receives an abundance of vibration, and also prevents the peas and hulls from escaping over its edges. I accomplish the result of keeping the apron straight in its passage over the rollers by providing it with the interior transverse slats and causing them to project against the side boards. These slats, although overlapping at their adjacent ends, serve the same purpose as would solid slats, so far as guiding or keeping the apron straight is concerned, but at the same time, owing to their peculiar construction and arrangement, they will bend out of a straight line, but not sufficiently to prevent their ends from forcibly pushing against the side boards. This bending or hinging action of the slats at their ends also permits the apron to be raised at its sides or edges, so as to roll the peas toward its center, and, also, it allows said apron to receive a greater vertical throw or toss than would be incident to the use of solid or unjointed slats running its entire width, since, were the latter used, their solid ends would rest upon the inclined guide-flanges of the side boards, and thus prevent the full drop of the apron and diminish its vibration."

The combination of this claim certainly has utility, but I have had some doubt whether it possesses patentable novelty. Careful consideration of the evidence, however, has failed to convince me that it was devoid of invention, and the prima facie presumption of its validity must prevail.

The application for patent No. 499,397, dated June 13, 1894, granted to Robert P. Scott, for a "Process of Gathering and Hulling Green Peas from the Vines," was filed November 12, 1892. In the description the patentee says:

"Until the invention of the mechanical impact process of hulling green peas by C. P. Chisholm and J. A. Chisholm, covered in United States patent No. 421,244, granted February 11, 1890, green peas had uniformly been hulled by hand in the practical art. The process of this patent relates to the hulling of picked green peas. My invention is an improvement upon this process by which I gather the vines with the green peas attached from the field by any suitable means, such as a rake or pulling machine, and then subject the mass of vines and attached green peas to the action of mechanical hulling appliances, preferably impact devices working according to the process of the Chisholm brothers. The gist of my invention lies in the discovery and the demonstration of the practicability of the idea that green peas could be hulled automatically while they are attached to their vines. It is old, as stated, to hull picked green peas mechanically by a gentle impact. It is old to hull dry ripe peas on the dried vines by subjecting them to the violent action of mechanical hulling appliances which tear the vines apart and do not injure the hard, dry peas but which would ruin green peas, either on the vine or off. Before my invention, however, it was never conceived to be possible or conceived at all that the gentle impact of the Chisholm process was sufficient to reach and operate on such peas when attached to, entangled

in or covered by a mass of green vines. In fact it was never even suggested that the green peas attached to the vines could be reached for hulling by even the most vigorously acting mechanical appliances which had been patented for hulling picked green peas before the invention of the Chisholm brothers, to say nothing of the fact that all such appliances were commercially unsuccessful since they bruised the peas."

The charge of infringement of this patent has been restricted to claim 2, which is as follows:

"2. The process of gathering and hulling green peas consisting in removing the vines from the ground with the green peas attached, subjecting the vines and attached peas while green to impact, of the character described, and separating the hulled green peas from the refuse."

There can be no question as to the great utility of the viner process as disclosed in this patent. The evidence abundantly shows it and it is admitted. It is an improvement on the Chisholm podder process, and while not so broad or primary an invention as the podder process constitutes a distinct and important advance in the art of hulling green peas. To do away with the picking of the peas before subjecting them to the process of hulling by treating the pea vines with the pods attached to the impact of the Chisholm process, not only involved an economy of time and labor, but served to keep the peas in better condition for the hulling. Peas in the pod attached to the vine even after the vine is removed from the earth continue fresh and tender much longer than when enclosed in the pod severed from the vine. The same kind of impact is applied in the viner process as in the podder process, though slightly differing in degree.

It is urged by the defendant that the viner process was anticipated by the Faure patent. But the same considerations which negative anticipation of the podder process patent by the Faure patent exclude anticipation of the viner process patent by the Faure patent.

It is further contended that, if the podder process patent in suit is valid, it anticipated the viner process, or, to employ the language of counsel, "the process of hulling green peas by impact, whether from the pods or vines, is so essentially the same that the invention of it as applied to either pods or vines would leave no room for patentable invention of it as applied to the other form." But the discovery which is embodied in the viner process was that the physical characteristics of the pea vine are such that the force of the comparatively gentle Chisholm impact would be transmitted through the vines and effectively hull peas from the pods "entangled in or covered by a mass of green vines."

This process certainly was not an obvious one. To avoid the labor and time involved in the picking of the pods and to preserve the peas in good condition would have furnished a strong incentive to any one skilled in the art of hulling green peas to resort to the viner process, yet of all the inventors engaged in advancing the art, aside from the complainants, no one conceived the idea. In fact the viner system on its introduction in various parts of the country was met with incredulity or astonishment. The patent under discussion clearly discloses the process and apparatus for its efficient conduct. It must be sustained unless invalid on one or more of the grounds hereinafter stated.

It is claimed that the process of this patent was disclosed by patent No. 399,702, dated March 19, 1889, granted to Robert P. Scott and John A. Chisholm, for "Improvements in Pea-Hullers." In the description the patentees say:

"Our invention relates to machines for hulling and separating green peas from their pods, and contemplates certain improvements upon the machine for which Letters Patent were granted to Robert P. Scott August 7, 1888, No. 387,318, whereby under our present improvements the vines and their attached pods of peas can be fed into the machine, the peas hulled or released from said pods, and vines and open pods carried along and delivered at the discharge end of the machine; and it consists in the improved construction and arrangement or combination of parts, hereinafter fully disclosed in the description, drawings and claims. The objects of our invention are, first, to provide means for hulling green peas from their pods without first removing said pods from the vines, so as to dispense with the time, labor, and expense incident to the old method of first picking the pods from their vines and then feeding them into the machine for being hulled or opened ; second, to provide improved means for feeding the vines and pods through the separating-cylinder, for preventing said vines from becoming twisted or entangled with the beaters of the hulling drum, and for adjusting the amount or rate of feed of the vines and pods through said separating-cylinder, and, third, to provide means for cutting the vines within the separating-cylinder, so as to prevent them from becoming bunched or clogged therein, and prepare them in suitable lengths for the pods therein to be readily hulled or opened. * * * Near the feed end of the separating-chamber are secured knives 21, which are preferably curved, although not necessarily so. These knives are preferably attached to adjacent pairs of the longitudinal bars or ribs 11 on opposite sides of said cylinder; also, the impact openers or beaters 16 are formed with recesses or notches 22, which register with said knives and permit of their passage therethrough. If desired, a greater number of knives may be secured in the cylinder at different points along the same, when the beaters will be formed with corresponding recesses or notches. I prefer to arrange these knives one in advance of the other along the separating-cylinder, so that long vines and such as may escape being cut by the first knife will be severed on reaching the second. * * * The operation of our improved machine is as follows: The vines and the peas in the pods attached thereto are fed into the feed end of the separating-cylinder, which receives them between its longitudinal bars or ribs and carries them slowly upward until they are caught by the beaters of the more rapidly-revolving hulling-drum and carried over the edges of the curved knives, which cut them into suitable lengths for proper treatment within and passage through said cylinder. * * * The beaters of the rapidly-revolving drum strike the pods on the vines with sufficient force to open them and release the peas, which then pass out through the perforations in the covering of the separating-cylinder. * * * The knives cut the vines into proper lengths to permit free action of the beaters thereon for opening the pods and to prevent said vines and pods from bunching or becoming clogged in the separating-chamber."

In this machine the knives are made an essential element. They are mentioned in six of the eight claims of the patent; the other two claims relating to details of the mechanical construction of the machine in other respects. Patent No. 399,702, shows an experimental and unsuccessful attempt to obtain the beneficial results of the viner process covered by patent No. 499,397. While it discloses the conception that the picking of the pods might be avoided and the peas successfully hulled from the vines in a machine, no operative means were devised to accomplish the desired end. The vines as taken from the field were not operated on by the hulling beaters. When fed into the machine they were rapidly carried against the knives and cut

into short pieces with the pods attached thereto. Many of the pods were cut and peas ruined by the action of the knives and the pieces of vines clogged the discharge end of the drum or cylinder owing to the peculiar construction of the machine. The cutting of the vines exposed many of the pods, which had escaped from the knives to the direct action of the beaters and the rest of the uninjured pods practically to the same direct action.

Indeed, it is stated in one part of the description that "the beaters of the rapidly-revolving drum strike the pods on the vines," and, in another, that "the knives cut the vines into proper lengths to permit free action of the beaters thereon for opening the pods." Instead of treating to the hulling process the vines as they came from the field the operation of the machine, so far as actual hulling was concerned, closely approximated to the hulling of picked pods. The machine together with its process was a failure and both were abandoned. The viner process patent in suit omits an essential element of the process of the machine just considered, namely, the cutting of the vines into pieces, and cannot be affected by patent No. 399,702 unless the latter patent so changed the prior art as to negative patentable novelty.

But in my judgment that patent did not effect such change. The patentees had no conception of the dynamical property of green pea vines by which the Chisholm impact is transmitted to and made operative on pods entangled in or covered by a mass of such vines. Nor had they any conception of any suitable apparatus to hull green peas on that principle. Nor would it have been important if they had conceived of the principle but failed to devise or select apparatus successfully to apply it. It was reserved to Scott, not only to make the discovery that green peas could by the Chisholm impact be hulled from vines as they came from the field, but to describe apparatus for successfully applying his discovery. There was nothing in the prior art to negative patentable novelty in his process. The evidence wholly excludes the idea that the viner process in suit was obvious or within the range of ordinary improvements by persons skilled in the art. Claim 2 of patent No. 499,397 must, therefore, be sustained.

The application for patent No. 500,299, dated June 27, 1893, granted to the three complainants for "Improvements in Pea-Hulling Machines" was filed May 2, 1891. In the description it is said:

"The general object of our invention is to provide a rapid and efficient green pea huller adapted to operate on the entire pea vine with its pods naturally attached thereto and thereby avoid the dilatory and expensive mode of picking the peas from the vines by hand. The machine is more especially designed for use by wholesale canners- and packers where there are large quantities of green peas to be handled and prepared in a limited space of time. In the consideration of our present invention it is necessary to bear in mind that it relates in no manner whatsoever to thrashing dried or thoroughly ripe peas, using the term in its botanical sense. While hard ripe peas are very easily thrashed after the manner of wheat and other like cereals, the hulling of the green peas used for canning purposes rests upon an entirely distinct theory therefrom, by reason of their well-known delicate nature and in the fact that they must be perfectly free from abrasions or bruises in order to possess an equal commercial value with the hand-shelled product. * * * It is evident that some changes in the construction and arrangement of the different parts of our mechanisms can be resorted to

without departing from the spirit of the invention and hence we do not limit ourselves to the exact construction and arrangement of its different parts but consider ourselves at liberty to make such alterations and changes as fall within the scope of our invention."

The charge of infringement of this patent has been restricted to the first six claims, as follows:

"1. A machine for hulling green peas from the vines comprising the combination of an inner revoluble drum provided with beaters and an outer revoluble drum, the latter being open-ended, thus having an uninterrupted passage way from end to end thereof for the transit of the vines therethrough substantially as described and for the purpose set forth.

"2. A machine for hulling green peas from the vines comprising the combination of an inner revoluble drum provided with beaters and an outer revoluble, spokeless, shaftless and open-ended drum provided with interior longitudinal vine elevating ribs substantially as described and for the purpose set forth.

"3. A machine for hulling green peas from the vines comprising the combination of a revoluble outer drum and an interior revoluble beater carrying drum, the inner drum being prolonged beyond the discharge end of the outer drum substantially as described and for the purpose set forth.

"4. A machine for hulling green peas from the vines comprising the combination of an inner revoluble drum provided with beaters, an outer revoluble, spokeless, shaftless and open-ended drum, a frame in which the drums are mounted and a covering upon the frame work inclosing the outer drum with the exception of a feed aperture, substantially as described and for the purpose set forth.

"5. A machine for hulling green peas from the vines comprising the combination of a revoluble outer drum and an inner revoluble beater carrying drum, the inner drum being prolonged beyond the discharge end of the outer drum, a supporting frame work, and rollers pivoted on the said frame work under each end of the outer drum substantially as described and for the purpose set forth.

"6. In a machine for hulling and cleaning green peas the combination of an endless traversing apron, revolving wheels supporting the said apron, transverse cleats secured to the said apron and extending from edge to edge thereon, fixed convex faced guide pieces in general line with the apron on each side thereof and having their convex surfaces toward the respective edges of the said apron substantially as described and for the purpose set forth."

It is admitted and the evidence shows that the apparatus covered by this patent has great utility. It is claimed, however, that the several claims in suit are void by anticipation or in view of the prior art. It is true that the elements entering into the combinations set forth in the several claims and also some, if not all, of those combinations, were in a broad sense old in the art. But all of these claims cover combinations of elements in the described machine for hulling green peas while attached to the vines, and have no other purpose. The automatic hulling of green peas so attached by the Chisholm impact was a new and important art. No machine was known which did or could conduct the process successfully or on a commercial scale.

Clearly the doctrine of analogous use has no applicability here as against the complainants. C. & A. Potts & Co. v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275. In that case the court says:

"Indeed, it often requires as acute a perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one

art may be 'made available in another, as would be necessary to create the device de novo."

Alterations of the old mechanism included in the several combinations were necessary to adapt the machine to its new use. The special adaptation of the parts composing the several combinations for the new industry involved repeated experiments and much ingenuity and expense during a long time, and, in my judgment, was an exercise of the inventive faculty. Even were the point less clear any doubt should, in view of the remarkable utility of the machine and the demand for it, be resolved in favor of the complainants. The first six claims of patent No. 500,299 must be sustained.

I now come to the question of infringement. The defendant admits that the machine he uses infringes all of the claims in suit of the viner machine patent No. 500,299. He denies that it infringes claim 5 of the podder machine patent No. 387,318, that claim being the only one insisted on by the complainants, or that the process used by him infringes either of the two claims of the podder process patent No. 421,244, or claim 2 of the viner process patent No. 499,397. With respect to the podder process he contends that the use of his machine does not infringe because, as he alleges, it practically amounts only to a threshing or hackling mechanism applied to the hulling of the peas. In the defendant's machine teeth or hackles are attached to the longitudinal ribs of the outer cylinder which pass between or intermesh with the beaters of the inside revoluble drum, such intermeshing evidently having been intended to tear apart the vines in order to enable the beaters to strike the vines and pods with better results. The defendant admits that his machine operates in part by the Chisholm impact, but claims that it mainly operates by "passing the vines and pods between and among intermeshing fingers."

The podder process patent in suit involved the treatment of pods only after separation from the vines. But the beaters of the defendant's machine strike not only the vines but pods, and release the peas by the Chisholm impact. The speed of the beaters is included within the limits of velocity of that impact. The vines and filled pods are carried to an elevated position in the cylinder and such of the pods as are struck by the beaters are struck while falling from the elevated ribs of the cylinder. It is quite clear on the evidence that the machine operates to hull green peas from separate pods and from pods attached to the vines principally by the Chisholm impact, and not, unless accidentally and to an insignificant extent, by a threshing, hackling or abrasion process. The use by the defendant of his machine unquestionably infringes both claims of Patent No. 421,244.

Infringement of claim 2 of the viner process patent No. 499,397 is denied on substantially the same grounds as those taken with respect to the question of infringement of the podder process patent in suit. Apart from the point next to be discussed, the same considerations which show infringement of the podder process patent equally or more strongly disclose infringement of the viner process patent. Elaboration here is unnecessary. That the process conducted within the cylinder of the machine used by the defendant is similar or identical with the process conducted by the complainants within the cylin-

der of their machine appears from the operation of their "Mutascope exhibit."

But infringement is denied on the further ground that the defendant did not separate the pea vines from the ground but bought them from others who delivered them at his cannery. The claim is as follows:

"2. The process of gathering and hulling green peas consisting in removing the vines from the ground with the green peas attached, subjecting the vines and attached peas while green to impact of the character described and separating the hulled green peas from the refuse."

Removing the vines from the ground with the green peas attached is made an element of the process of this claim. The patent discloses a certain mechanism for pulling the vines from the ground, but the patentee is not confined to such mechanism for effecting such removal. The description states that it may be done "by any suitable means." Severance by the "pulling machine," by scythe, by rake or by hand, would each and all have met the first requirement of the claim. It is, of course, necessary that the vines be severed from the ground before they can be subjected to the hulling and separating treatment. Had removal from the ground been omitted from the claim its other elements would of themselves have been patentable as a combination process. But, such removal having been unnecessarily included in the claim as one of its elements, has not the defendant in a legal sense removed the vines from the ground with the green peas attached? In my judgment he has. It was not necessary to an infringement that the defendant should personally sever the vines. Qui facit per alium facit per se. The doing of that work by his employés would have the same legal effect. So the removal of the vines by persons not employed by the defendant, but by his procurement, request or invitation, express or implied, would not differentiate the case. The defendant is a canner. He furnishes pea growers with pea seed. He contracts with them before the severance of the vines from the ground for their purchase and delivery at his cannery. Pursuant to the contract of purchase the pea vines with the pods attached are delivered to him and subjected to the process of hulling and separation included in the claim. These facts clearly amount to infringement. To hold otherwise would sanction the most palpable evasion of the rights of the patentee. Claim 2 of patent No. 499,397 must be held to have been infringed.

The defendant, as already stated, denies infringement of claim 5 of the podder machine patent No. 387,318. It is as follows:

"5. In a machine for hulling and separating green peas, an endless inclined separating-apron provided with transverse slats arranged on the inside thereof, in combination with the rollers and the vertical side boards arranged at the sides or edges of said apron and operating to keep the same straight upon said rollers, substantially as described."

While claims 1, 2, 3, 4 and 6 require hinged or overlapping slats, claim 5 does not in terms require such slats, and, when read alone, covers cross-bars or slats, each extending from one edge of the apron to the other. The contrast between the several claims when taken literally affords some color to the charge of infringement. In the

·machine used by the defendant there are transverse slats on the inner side of the apron extending from edge to edge, each of such slats consisting of only one solid piece, and if the combination of · claim 5 includes such non-hinged or non-overlapping slats, it has been infringed. It is true that Scott states in the description that "these slats, although overlapping at their adjacent ends, serve the same purpose as would solid slats, so far as guiding or keeping the apron straight is concerned." But it is clear on examination of the description and drawings in connection with claim 5 that the machine therein ·described and intended to be patented did not include cross-bars or transverse slats each extending in one piece from edge to edge of the apron. Nowhere in the description can be found any statement or expression indicating that they were to enter into the machine, and the essence of the invention, as stated by the patentee, negatives their use. He says:

"These slats, although overlapping at their adjacent ends, serve the same purpose as would solid slats, so far as guiding or keeping the apron·straight is concerned; but at the same time, owing to their peculiar construction and arrangement, they will bend out of a straight line, but not sufficiently to prevent their ends from forcibly pushing against the side boards. This bend-ing or hinging action of the slats at their ends also permits the apron to be raised at its sides or edges, so as to roll the peas toward its centre, and, also, it allows said apron to receive a greater vertical throw or toss than would be incident to the use of solid or unjointed slats running its entire width, since .were the latter used their solid ends would rest upon the in-clined guide-flanges of the side boards, and thus prevent the full drop of the apron and diminish its vibration."

The words "transverse slats" as employed in claim 5 must be read "substantially as described," and when so read the machine used by the defendant does not infringe the combination of the claim.

The defendant contends, by way of further defense, that, assuming that the patents in suit have been infringed by the use of the machine complained of, he was not an infringer. The defendant and John H. Empson entered into a written contract March 10, 1897, as follows:

"This Contract, Made this tenth day of March, 1897, between John H. Empson, of the County of Boulder and State of Colorado, party of the first part, and Zack. Johnson, of the County of Kent and State of Delaware, of the second part,

Witnesseth That, for and in consideration of the covenants and agreements hereinafter set forth to be kept and performed by party of the second part, the said party of first part hereby agrees to thresh for party of second part 250 or more acres of peas per year beginning with the season of 1897 and terminating with the season of 1897.

Said party of the second part agrees that he will grow and furnish to said party of first part for threshing not less than 250 or more. acres of peas per year, and that he will supply said party all necessary power and labor for the purpose of operating the machinery necessary to be used by party of first part, together with all necessary belting for the transmission of said power to said machinery, and also reasonable proper covering and protection for said machinery during the period of the contract, and for eight months thereafter, machinery to be on the ground of party of second part by May 15, 1897. Party of first part to furnish three cleaners for peas, said party of second part further agrees to pay said party of first part for such thresh-ing twelve cents per case for each and every case of twenty-four No. 2 cans

or its equivalent, put up by said party of second part, payable on the first of each month for all peas threshed during the preceding month.

In Witness Whereof, the said parties have set their hands on the day and year aforesaid.

(Signed.)                                              J. H. Empson.
                                                       Zack Johnson."

The answer contains the following statement of what was done in consequence of the above contract:

"And this defendant says that in pursuance and performance of said contract said Empson furnished and set up two machines on this defendant's premises and by them threshed a quantity of peas belonging to this defendant. The peas threshed were raised by farmers in the vicinity under contract of purchase by this defendant and were by them cut and delivered at the defendant's premises. The machines were set up and operated by one David Segfreid, agent of said Empson, and were under his sole and exclusive management and control during all the time said work was going on, no part of the work being done by this defendant or his employees except the handling of the peas before and after the operation of threshing. The power to operate the machines was taken from an engine belonging to the defendant."

It appears from the testimony of the defendant that he knew of the complainant's viner machine before entering into the contract with Empson; that the latter undertook to indemnify the defendant against loss or damage by reason of the machines so set up on his premises "being claimed as infringement on patents"; that the defendant furnished the power to operate the machines and the "labor to feed the machines and to take the peas from them;" that men employed by him canned the peas after they were hulled by such machines; that he sold the canned peas and received the profit derived from them; that the object of the presence of the agent or representative of the owner of the machines was "to keep the machines in order, to superintend the machines." It further appears from the evidence that with the exception of the person employed by the owner of the machines to look after their condition, all persons handling them or at work about them were employed by the defendant. On these facts there can be no doubt either on reason or on the authorities that the defendant is liable for the infringement. 3 Rob. Pat. §§ 897, 946; Walk. Pat. § 406.

Probably the most embarrassing question in the case has been raised by the objection of multifariousness and misjoinder. The bill avers with respect to all the patents in suit:

"That your orators are now the exclusive owners of said several letters patent above recited, and hold among themselves the entire title to each of said letters patent and to all claim for infringement or violation thereof, and are entitled to sue for and recover said claim to their own use. And your orators further show that the inventions patented by all of said letters patent above recited are capable of conjoint use in the same structure, and aver, on information and belief, that the defendant so used the same in the infringements hereinafter complained of."

The bill prays, among other things, that the defendant be compelled to account for and pay to the complainants all profits derived or to be derived by the defendant from his infringement of the four patents in suit, or any of them. On or about August 12, 1890, the

Chisholms assigned to Scott three-tenths of their entire interest in patent No. 421,244. The answer states:

"Said defendant denies that said complainants are now the exclusive owners of said letters patent, and hold among themselves the entire title to each of said letters patent, jointly or in common, or are entitled to sue for and recover for infringement of said patents jointly as in this action sued."

The ownership of the several patents in suit appears from a stipulation entered into by counsel after the filing of the answer as follows:

"It is stipulated and admitted by and between counsel for the respective parties hereto that Robert P. Scott, Charles P. Chisholm and John A. Chisholm, mentioned as complainants in this cause, are the owners of letters patent 421,244, February 11, 1890, and 500,299, June 27, 1893, and that said Scott is the owner of letters patent 499,397, June 13, 1893, and 387,318, August 7, 1888."

The complainants suggest rather than contend that an objection of multifariousness and misjoinder should be raised by demurrer or plea and cannot be made by answer. A literal reading of equity rule 39 seems to except from the matters of defense upon which a defendant by way of answer is entitled to insist "matters of abatement, or to the character of the parties, or matters of form." This rule and rule 39 in equity promulgated by the supreme court at the January term, 1842, 1 How. liii. are in ipsissimis verbis. Prior to 1842 no rule on the subject had been prescribed by the supreme court. It has, however, several times during the existence of rule 39 been recognized by the highest authority that the objection of misjoinder and multifariousness can be insisted upon by answer. In Oliver v. Piatt, 3 How. 333, 412, 11 L. Ed. 622, decided at the December term, 1844, the court said:

"The objection of multifariousness cannot be a matter of right, be taken by the parties, except by demurrer or plea, or answer; and if not so taken it is deemed to be waived. It cannot be insisted upon by the parties even at the hearing in the court below, although it may at any time be taken by the court sua sponte, wherever it is deemed by the court to be necessary or proper to assist it in the due administration of justice."

So in Hefner v. Insurance Co., 123 U. S. 747, 751, 8 Sup. Ct. 337, 31 L. Ed. 309, the court said:

"Multifariousness as to subjects or parties, within the jurisdiction of a court of equity, cannot be taken advantage of by a defendant, except by demurrer, plea or answer to the bill, although the court in its discretion may take the objection at the hearing, or on appeal, and order the bill to be amended or dismissed."

No express reference is made in either of the above decisions to rule 39, but it is hardly to be assumed that the same court which promulgated the rule was oblivious of its existence. The fact that the above quoted language was employed affords strong ground for an inference that the objection of misjoiner and multifariousness was considered by the court as not excluded by that rule from defenses proper to be set up in an answer, when not so apparent on the face of the bill as to justify a demurrer.

But whether such an objection can or cannot properly be taken by way of answer, it is well settled that the court sua sponte may

give effect to it whenever that course is deemed conducive to the due and convenient administration of justice. Oliver v. Piatt, supra; Hefner v. Insurance Co., supra; Story, Eq. Pl. § 284a.

The objection of multifariousness is one which addresses itself to the sound discretion of the court to be exercised with a view to the position of the parties and the circumstances of the particular case, but not without regard to fundamental principles controlling equity procedure. While care should be taken to avoid a departure from those elementary rules which long experience has shown best calculated on the whole to secure simplicity and certainty in the determination of litigated cases and prevent an unnecessary and embarrassing joinder of parties or causes of action in one suit, it equally should be observed to avoid the annoyance and expense which would result from an unnecessary multiplicity of suits. The complainant Scott is the sole owner of patents Nos. 387,318 and 499,397, and the three complainants are the joint owners or owners in common of patents Nos. 421,244 and 500,299. The complainants as co-partners operate under these several patents. In so far as the Chisholms operate under the patents solely owned by Scott, they must be regarded as co-operating with Scott as his exclusive licensees for that purpose.

Passing for the present the question of misjoinder of parties, it is quite clear that, if the inventions covered by the claims of the four patents were capable of conjoint use and were used in the defendant's machine, and if all the patents were solely owned by one person, but one suit would have been necessary to enforce the rights of the owner with respect to the several patents. The bill avers that all the inventions covered by them are capable of conjoint use in the same structure, and that the defendant so used the same in the infringements complained of. The bill, therefore, was not demurrable on the ground of multifariousness by reason of the joinder of patents. Indeed, the answer neither admits nor denies such capability of conjoint use, nor was such denial made on the part of the defendant at the hearing. It is true that the defendant did not infringe claim 5 of the podder machine patent, but failure to establish infringement in that respect does not afford any reason why the bill should be wholly dismissed. The complainants have proved infringement of the other three patents in suit under a bill not multifarious on its face. There is no evidence of bad faith on their part in alleging a conjoint use by the defendant. They filed their bill in good faith, have proved infringement by the conjoint use of inventions covered by three of the patents, and aside from the question of misjoinder of parties are entitled to relief for such infringement. This conclusion is fully justified by judicial practice in like cases. Sharples v. Manufacturing Co. (C. C.) 75 Fed. 595; Id., 26 C. C. A. 327, 81 Fed. 179; Green v. City of Lynn (C. C.) 81 Fed. 387.

Has there been a fatal misjoinder of parties? The complainants have sued as co-partners, and seek relief in that capacity. The patents in suit are not owned by them as a firm. Two of the patents are owned by all of the complainants in their individual capacity, either jointly or in common, and the remaining two solely by one of

them. In Sargent v. Lock Co., 17 Blatchf. 244, Fed. Cas. No. 12,366, the bill was filed by James Sargent charging infringement of a patent solely owned by him. The case was heard on exceptions to the master's report. It appears that the complainant was in co-partnership with one Greenleaf, and that the firm of Sargent & Greenleaf operated under Sargent's patent. The court said:

"Exception seven of the defendant excepts to the report for that the master erred in assessing damages which are not the damages suffered by the plaintiff, but are those suffered by the firm of Sargent & Greenleaf, and alleges that the master should have reported, that the damage, if any, found to have been suffered by said firm, is not the damage of the plaintiff, who is only one member of said firm, but that the plaintiff's damage is merely a portion thereof. * * * The plaintiff, as the owner of the patent, is entitled to recover the damages in this case. He may be accountable to his co-partner for a part of them, but the co-partner could not sue, on the patent, for such damages, or any part of them."

This case was taken to the supreme court. Lock Co. v. Sargent, 117 U. S. 536, 6 Sup. Ct. 934, 29 L. Ed. 954. The latter court, after quoting exception seven as set forth in the case below, said:

"The decision that the plaintiff, as owner of the patent, was entitled to recover the damages, was correct."

It will be observed that, while the supreme court agreed with the circuit court in holding that the plaintiff was entitled to recover the damages, it did not say that "the co-partners could not sue on the patent for such damages, or any part of them." Nor did the facts call for such expression, as the suit had been brought, not by the firm, but by Sargent alone as sole owner of the patent who would be accountable to his co-partner according to the terms of the co-partnership. It cannot fairly be inferred from this case that if Sargent & Greenleaf had joined as complainants the supreme court would have held that they were not entitled to relief. Such an inference is repelled by the language of that court in other cases and by numerous decisions. A mere licensee, though exclusive has no legal title to or legal interest in a patent, and cannot alone, unless in case of infringement of his rights by the legal owner, maintain in his own name an action at law or a suit in equity against an infringer. An action at law must be brought in the name of the legal owner only. An exclusive licensee, whether the license be oral or in writing or created by implication, has, however, an implied authority to use the name of the legal owner both at law and in equity whenever necessary for his own protection. Brush Electric Co. v. California Electric Light Co., 3 C. C. A. 368, 52 Fed. 945, 961; Walk. Pat. § 400. But in a suit in equity an exclusive licensee properly may, and in many cases must, be joined with the owner as a cocomplainant. In Birdsell v. Shaliol, 112 U. S. 485, 5 Sup. Ct. 244, 28 L. Ed. 768, the court said:

"A licensee of a patent cannot bring a suit in his own name, at law or in equity, for its infringement by a stranger; an action at law for the benefit of the licensee must be brought in the name of the patentee alone; a suit in equity may be brought by the patentee and the licensee together."

The rule thus laid down by the supreme court has been illustrated and applied in many cases. Hammond v. Hunt, 4 Ban. & A. 111;

Fed. Cas. No. 6,003; Owatonna Mfg. Co. v. F. B. Fargo & Co. (C. C.) 94 Fed. 519; Brush-Swan Electric Light Co. v. Thomson-Houston Electric Co. (C. C.) 48 Fed. 224; Brush Electric Co. v. Electric Imp. Co. (C. C.) 49 Fed. 73; Patterson v. Stapler (C. C.) 7 Fed. 210; Gamewell Fire Alarm Tel. Co. v. City of Brooklyn (C. C.) 14 Fed. 255; Sharples v. Manufacturing Co. (C. C.) 75 Fed. 595; Huber v. Sanitary Depot (C. C.) 34 Fed. 752. It is also recognized in the text books. Walk. Pat. § 400.

If the Chisholms were clothed with the rights of exclusive licensees under patents Nos. 387,318 and 499,397 they properly could be joined as complainants with Scott as to these patents. But if the Chisholms, who have no legal title or legal interest in these two patents, cannot be regarded technically as exclusive licensees of Scott to co-operate with him under them, they, nevertheless by reason of their partnership relation, have an equitable right and interest therein which have been invaded. They, as well as Scott, are entitled by the fundamental rules of equity to equitable relief. Where the legal title to a patent is vested solely in one person and a suit in equity is brought for infringement, seeking an injunction and an account, the legal owner and those possessing equitable rights which may be effected should join as complainants. Stimpson v. Rogers, 4 Blatchf. 333, Fed. Cas. No. 13,457; 3 Rob. Pat. § 1098.

The question of misjoinder of parties is thus reduced to the point whether, although all the legal owners of the patents in suit are parties complainant on the record, the bill is fatally defective or cannot be sustained in its present form, because two of the four patents are solely owned by Scott. The objection involves a denial of the right of the Chisholms to sue on the two Scott patents.

In my judgment the point thus presented is under the peculiar facts of the case technical and unsubstantial. The course pursued by the complainants entails no unnecessary hardship or expense upon the defendant. In Bates v. Coe, 98 U. S. 31, 48, 25 L. Ed. 68, the court said:

"More than one patent may be included in one suit, and more than one invention may be secured in the same patent: in which cases the several defences may be made to each patent in suit, and to each invention included in the bill of complaint."

If two suits had been brought, one on Scott's patents, and the other on the patents belonging to the three complainants, instead of one suit on all the patents, the condition of the defendant would not have been better. On the contrary it would have been much worse. Much of the evidence would have been duplicated and the annoyance and expense of the litigation largely increased, and the defendant could not possibly have derived any benefit or protection which he has not had the opportunity of receiving under the course actually pursued. If two such suits had been brought and a decree rendered in each for an account of profits or damages, it would have been embarrassing, if not impracticable, justly to make apportionment of such profits or damages between the complainants in such suits. The course pursued obviates this difficulty. All the owners of the four patents having joined as complainants, and prayed that

all profits derived by the defendant from infringement be paid to all the complainants as co-partners, it is evident that a payment of profits under the decree of this court pursuant to that prayer would have precluded the complainants and each of them from afterwards recovering from the defendant the amount or any portion of the amount so paid. Further, the case has been simplified by the waiver by the complainants in open court of any account of profits or damages. The relief they now ask is restricted to an injunction.

There are some cases, though few, which bear more or less directly on the point under consideration. In Huber v. Sanitary Depot (C. C.) 34 Fed. 752, it appears that Huber was sole owner of a patent and Boyle was sole owner of another patent. Huber was also the exclusive licensee of Boyle under the patent owned by the latter. The defendant infringed both patents by their conjoint use. Huber and Boyle joined as complainants. There was a demurrer for misjoinder of parties. The court in overruling the demurrer, said:

"The point raised is a new one, and in determining it the court is governed by those analogies which seem best founded in general convenience, and will best promote the administration of justice, without multiplying unnecessary litigation on the one hand, or drawing suitors into unnecessary expenses on the other."

So in Sharples v. Manufacturing Co. (C. C.) 75 Fed. 595, it appears that two patents were in suit, one of them owned by both complainants and the other by only one of them, of whom the other was an exclusive licensee. Question having been made as to the right to maintain the suit under these circumstances, the court said:

"The entire right to both patents is in the plaintiffs, between them, without any outstanding interest to menace the defendant in any other suit. This seems to be sufficient."

The objection of misjoinder of parties, had it been taken by demurrer or plea, possibly would have been entitled to greater weight. The joinder of patent owners as complainants, where some of them have no legal ownership of or legal interest in some of the patents sued on, is a course which generally should not be encouraged. But the objection having been first raised by answer, and not having been brought to the attention of the court until final hearing, it cannot in view of the particular circumstances of this case be sustained.

The complainants are entitled to relief by way of injunction as to claims 1 and 2 of patent No. 421,244, claim 2 of patent No. 499,397, and claims 1, 2, 3, 4, 5 and 6 of patent No. 500,299. With respect to costs it manifestly would be unjust and inequitable to divide them equally between the parties, and it is, therefore, held that the defendant must pay three-fourths, and the complainants the remaining one-fourth, of the costs of the case.

Let a decree be prepared in accordance with this opinion.